J-S43006-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| GREGORY DAVID HOWARD | |
| Appellant | No. 1285 WDA 2016 |

Appeal from the Judgment of Sentence entered October 1, 2015
In the Court of Common Pleas of Westmoreland County
Criminal Division at No: CP-65-CR-0005467-2014

BEFORE:  STABILE, J., SOLANO, J., and FITZGERALD, J.[*]

MEMORANDUM BY STABILE, J.:                    FILED OCTOBER 25, 2017

Appellant, Gregory David Howard, appeals from the October 1, 2015 judgment of sentence imposing an aggregate 20 to 40 years of incarceration for two counts of robbery, one count of aggravated assault, one count of simple assault, one count of unlawful restraint, one count of theft by unlawful taking, one count of receiving stolen property, and one count of conspiracy.[1]  Also before us are Appellant's pro se applications for appointment of new counsel.  We affirm the judgment of sentence and deny the applications for appointment of new counsel.

_____

[*] Former Justice specially assigned to the Superior Court.

[1]  18 Pa.C.S.A. §§ 3701(a)(1)(i) and (ii), 2702(a)(1), 2701(a)(1), 2902(a)(1), 3921(a), 3925(a), and 903(a)(1), respectively.

The trial court summarized the pertinent facts:

The charges in this matter arise from an incident that occurred on October 21, 2014, in West Newton, Westmoreland County, Pennsylvania. The facts set forth herein are derived from testimony presented at trial of this matter that occurred between July 6 and July 9, 2015.

Codefendant Brandon Danilchak testified that two days before the crime, he, [Appellant], and an individual named Derrell Adams met at [Appellant's] residence to discuss a potential home invasion. Danilchak stated that [Appellant] and Adams spoke with him about an older woman who had loaned money to Adams. They believed that she would have a large amount of cash inside her home.

Adams described the layout of the house, and that [Appellant] had stated that he was familiar with the area where the home was located. On the morning of October 21, 2014, [Appellant] picked up Danilchak from his apartment at approximately 5 a.m. Danilchak testified that he, [Appellant], Lamont Dixon, and Darrell Adams all agreed that they would commit the home invasion. Adams again instructed the group regarding the layout of the home. [Appellant] supplied the group with gloves to avoid leaving fingerprints at the crime scene, and they departed in Dixon's vehicle, a white Chevy Malibu.

Frances Tekavec, a 91-year-old woman, was at her residence in West Newton on October 21, 2014, at approximately 6:30 a.m. when employees from Levin's Furniture arrived to deliver two mattresses that she had ordered. Roughly five minutes after the deliverymen departed, a Caucasian male, later identified as Brandon Danilchak, knocked on her door, stating that he was from Levin's furniture, and had forgotten to have her sign a receipt. The man stepped in to her home, and as Ms. Tekavec searched for a pen, another individual, described as a tall African American male and later identified as Lamont Dixon, entered her home wearing a black hoodie sweatshirt. As he entered, he grabbed the victim's shoulders and threw her across the kitchen. Her head hit the refrigerator, and as she landed on the ground on her back, he held a knife to her side and demanded money. The victim stated that she had no money except what was in her purse. The individual inquired as

to the location of her purse, and when the victim indicated it was in her bedroom, the individual dragged the victim into the bedroom, as she could not walk due to the fall. The individual removed approximately $30 from her purse. He then opened her jewelry chest and emptied two drawers which were filled with various types of jewelry. He also removed the victim's jewelry from her person. The first individual then approached the victim's wall safe, but was unsuccessful in opening it without a key. When the victim informed him that she did not wish to give him the key, he held a knife to the victim's small dog and said that if she did not give him the key, he would kill her dog.

The victim then noted that a third individual, a heavyset African-American later identified by the victim as [Appellant], entered her home. The victim noted that he was wearing a robe and a mask. [Appellant] grabbed her and threw her on her bed. He then threw a sheet over her face to impede her vision. The victim's wrists were bound with electrical cord, and her ankles were bound with a surgical stocking. The victim noted that her ankles and wrists were bound so tightly that her flesh was removed. After the three individuals finished removing items and cash from the safe and other items from her home, they departed. It took the victim approximately 20 minutes to work her bindings until she was able to call 9-1-1. The victim was transported to the hospital, where she was diagnosed with a broken neck and broken vertebrae in her back. She testified that she still suffers from terrible pain, which limits her ability to walk. The three individuals removed approximately $13,000 worth of items. The victim also noted that she had reported to the police a strange vehicle outside of her home the day prior, which she identified as a white sedan.

Bobbi Drudl testified that she was the girlfriend of codefendant Lamont Dixon on the day of the crime. Drudl testified that on the morning of October 21, 2014, she woke to find that her car was missing, which she identified as a white Chevy Malibu. Drudl stated that she was unnerved because she needed the car to drive to work. She attempted to call Dixon, but his phone was turned off. She stated that at roughly 8 a.m., Dixon finally contacted her using his uncle, [Appellant's] cell phone. Dixon stated that he was on his way back to Drudl's home. Drudl stated that when Dixon returned, he was wearing a black hoodie sweatshirt. He left again for a few moments, and when he returned, he handed Drudl two $100 bills and stated

that she should use the money to pay his cell phone bill, keep $40, and save $100. Drudl and Dixon then got into the car. Drudl asked Dixon where the money came from. Dixon stated that he had robbed somebody. When Drudl inquired further, Dixon stated that he had robbed an old lady.

When the pair arrived at Dixon's apartment, Dixon removed jewelry and a few gold coins from his pockets and laid them on Drudl's front seat. Dixon told Drudl to keep the jewelry in her purse. While Drudl was driving to work, she received a call from [Appellant] asking where he could find Dixon. He called twice more, each time asking the whereabouts of Dixon. Soon after, Dixon called Drudl, using [Appellant's] cell phone, and told her to have a good day. That same day, Cindy Danilchak testified that she received a call from [Appellant's] cell phone number inquiring whether she would be available to travel to a nearby pawnshop to pawn some items.

On October 22, 2014, Dixon and Drudl read an article online regarding the robbery. Dixon stated this was not how it was supposed to happen.

Sergeant Scott Sokol of the Rostraver Township Police Department testified that he responded to a report of a home invasion at the victim's home on October 21, 2014. Sergeant Sokol noted footprints outside of the home in the snow, which led to a tire burnout in the grass. Sergeant Sokol also eventually recovered two pairs of latex gloves, and orange garments that codefendant Dixon later stated they used to cover their faces. Officer Michael Sethman, who responded to the call, testified that the piece of paper that had been handed to the victim by the first individual was actually a paystub for Bobbi Drudl.

Bridget Ross testified that in the early morning hours of October 23, 2014, Lamont Dixon began 'beating' on her back door. She testified to her encounter with Dixon:

> Ross: I was with, um, a guy that he came in to talk and he beat on the door, he was crying, he expressed that him and a couple individuals had did a home robbery and he didn't want to live no more with his past background, that they were going to give him 20 years to life, and he just wanted somebody to give him a gun so he could just end his

- 4 -

> life now because he was in so much remorse. He also stated that the other two individuals involved were [Appellant] and Brandon Danilchak.

Trial Court Opinion, 6/9/16, at 1-5 (record citations omitted).

At trial, Appellant chose to represent himself with standby counsel present. On July 9, 2015, a jury found Appellant guilty of the aforementioned charges. Appellant filed a timely post-sentence motion, which the trial court denied on June 9, 2016. Appellant did not file a timely appeal, but appointed counsel successfully petitioned for the right to file this nunc pro tunc direct appeal.

Appellant raises several pre-trial issues, including the Commonwealth's alleged failure to turn over exculpatory evidence and disclose a plea agreement with one of Appellant's codefendants. Appellant also argues he was denied his right to a fair trial because the trial court did not provide civilian clothes to his inmate defense witnesses. Appellant also argues he was deprived of his right to a fair trial because he had a disciplinary complaint pending against standby counsel. Finally, Appellant challenges the sufficiency of the evidence in support of each of his convictions. Appellant's Brief at 5.

We have reviewed the parties' briefs, the trial court opinion, the applicable law, and the record. We conclude that the trial court's June 9, 2016 opinion accurately addresses all of Appellant's arguments. Concerning Appellant's assertions of various pretrial errors, we observe that Appellant

withdrew all of his pretrial motions and thereby waived the issues he raised therein.  Trial Court Order, 4/22/14.

Concerning Appellant's fair trial arguments, the record indicates that Appellant never requested civilian clothes for his incarcerated defense witnesses.  Acting as his own attorney, Appellant had the duty to procure civilian clothes for his witnesses or at least ask standby counsel to do so.  He failed to do so.  This argument lacks merit.  Appellant cites no law providing that the trial court had an affirmative obligation to provide civilian clothes, nor does Appellant cite any law providing that reversible error occurs where defense witnesses (as opposed to the defendant himself) appear in court wearing prison garb.

The trial court correctly notes that the record fails to support Appellant's contention that the Commonwealth failed to produce exculpatory evidence or failed to disclose plea agreements with Appellant's codefendants.  Both codefendants took the stand and denied any such agreement.  Appellant also argues his cell phone records were exculpatory.  As the trial court explains, Appellant's cell phone records were examined extensively at trial and the Commonwealth used them to corroborate the testimony of prosecution witnesses.  Appellant cannot satisfactorily explain why his cell phone records would have exonerated him.  He also does not explain why he could not have subpoenaed them himself.

Appellant's argument that he was denied a fair trial because the Commonwealth failed to call every investigating officer to the witness stand fails because, as the trial court explains, the law does not require the Commonwealth to do so. The prosecution is free to determine what evidence is needed to prove its case beyond a reasonable doubt. Further, Appellant could have subpoenaed any witness he believed could provide exculpatory information.

Next, we observe that Appellant's strained relationship with standby counsel does not merit a new trial. Appellant does not identify any action or inaction on standby counsel's part that prejudiced Appellant's case, nor does he explain how any such action or inaction would entitle him to relief, given his choice to proceed pro se.

The trial court properly rejected Appellant's sufficiency of the evidence arguments. As recited above, the record contains overwhelming evidence of Appellant's guilt. The jury was free to credit the testimony of the various witnesses, including the codefendants, who implicated Appellant.

Finally, we deny Appellant's pro se applications for appointment of new appellate counsel. The record indicates Appellant's persistent efforts, by numerous letters, to control appellate counsel's professional judgment. Counsel's brief was sufficient to facilitate our review of this case, and we decline to delay this matter by remanding for new counsel and a new briefing schedule.

Judgment of sentence affirmed. Applications for relief denied.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/25/2017

# IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA – CRIMINAL DIVISION

EXHIBIT (F)

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | ) | |
| | ) | |
| VS. | ) | |
| | ) | NO.   5467 C 2014 |
| GREGORY DAVID HOWARD, | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF THE COURT
## ISSUED PURSUANT TO PA.R.A.P. RULE 1925

**AND NOW,** this⸚⸚ day of September, 2016, it appearing to the Court that the

Defendant filed a Notice of Appeal from the Court's dismissal of his post-sentence motions and

Opinion dated June 9, 2016, and that the Defendant filed a Concise Statement of the Errors

Complained of on Appeal as Ordered by this Court, pursuant to Rule 1925(a) of the Rules of

Appellate Procedure, the reasons for said decision appear in the Court's Opinion and Order of

Court dated June 9, 2016, which is attached for reference.

### BY THE COURT:

_____
Rita Donovan Hathaway, Judge

ATTEST:

_____
CLERK OF COURTS

cc:   File
      Karen Patterson, Esq., Assistant District Attorney
      Timothy Dawson, Esq., Appointed Defense Counsel
      Pamela Neiderhiser, Esq., Court Administrator's Office

# IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA – CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA )
)
VS. )
) NO. 5467 C 2014
GREGORY DAVID HOWARD, )
)
Defendant. )

## OPINION AND ORDER OF COURT

This matter comes before the Court for consideration of Defendant's Post-Sentence Motions that have been filed in the above-captioned case.

## FACTUAL HISTORY:

The charges in this matter arise from an incident that occurred on October 21, 2014, in West Newton, Westmoreland County, Pennsylvania. The facts as set forth herein are derived from testimony presented at trial of this matter that occurred between July 6 and July 9, 2015.

Codefendant Brandon Danilchak testified that two days before the crime, he, Defendant, and an individual named Darrell Adams met at Defendant's residence to discuss a potential home invasion. (TT 464-65)[1]. Danilchak stated that Defendant and Adams spoke with him about an older woman who had loaned money to Adams. They believed that she would have a large amount of cash inside her home. (TT 465).

Adams described the layout of the house, and that Defendant had stated that he was familiar with the area where the home was located (TT 466). On the morning of October 21,

---

[1] Numerals in parenthesis preceded by the letters "TT" refer to specific pages of the transcript of the trial held between June 6 and June 9, 2015, and made a part of the record herein.

1

2014, Defendant picked up Danilchak from his apartment at approximately 5 a.m. Danilchak testified that he, Defendant, Lamont Dixon, and Darrell Adams all agreed that they would commit the home invasion. (TT 468). Adams again instructed the group regarding the layout of the home. (TT 468). Defendant supplied the group with gloves to avoid leaving fingerprints at the crime scene, and they departed in Dixon's vehicle, a white Chevy Malibu. (TT 468-69).

Frances Tekavec, a 91 year-old woman, was at her residence in West Newton on October 21, 2014 at approximately 6:30 a.m. when employees from Levin's Furniture arrived to deliver two mattresses that she had ordered. (TT 214). Roughly five minutes after the deliverymen departed, a Caucasian male, later identified as Brandon Danilchak, knocked on her door, stating that he was also from Levin's furniture, and had forgotten to have her sign a receipt. (TT 214). The man stepped into her home, and as Ms. Tekavec searched for a pen, another individual, described as a tall African American male and later identified as Lamont Dixon, entered her home wearing a black hoodie sweatshirt. (TT 214-15). As he entered, he grabbed the victim's shoulders and threw her across the kitchen. Her head hit the refrigerator, and as she landed on the ground on her back, he held a knife to her side and demanded money. (TT 216). The victim stated that she had no money except what was in her purse. (TT 224). The individual inquired as to the location of her purse, and when the victim indicated that it was in her bedroom, the individual dragged the victim into the bedroom, as she could not walk due to the fall. (TT 224). The individual removed approximately $30 from her purse. (TT 224). He then opened her jewelry chest and emptied two drawers which were filled with various types of jewelry. (TT 225-26). He also removed the victim's jewelry from her person. (TT 226). The first individual then approached victim's wall safe, but was unsuccessful in opening it without a key. (TT 226). When

2

the victim informed him that she did not wish to give him the key, he held a knife to victim's small dog and said that if she did not give him the key, he would kill her dog. (TT 226).

The victim then noted that a third individual, a heavyset African-American later identified by the victim as Defendant Gregory Howard, entered her home. (TT 226). The victim noted that he was wearing a robe and a mask. (TT 227). Defendant grabbed her and threw her on her bed. (TT 226). He then threw a sheet over her face to impede her vision. (TT 227). The victim's wrists were bound with electrical cord, and her ankles were bound with a surgical stocking. (TT 228). The victim noted that her ankles and wrists were bound so tightly that her flesh was removed. (TT 228). After the three individuals finished removing items and cash from the safe and other items from her home, they departed. (TT 228). It took the victim approximately 20 minutes to work her bindings until she was able to call 9-1-1. (TT 228). The victim was transported to the hospital, where she was diagnosed with a broken neck and broken vertebrae in her back. (TT 231). She testified that she still suffers from terrible pain, which limits her ability to walk. (TT 231). The three individuals removed approximately $13,000 worth of items. (TT 232). The victim also noted that she had reported to the police a strange vehicle outside of her home the day prior, which she identified as a white sedan.

Bobbi Drdul testified that she was the girlfriend of codefendant Lamont Dixon on the day of the crime. Drdul testified that on the morning of October 21, 2014, she woke to find that her car was missing, which she identified as a white Chevy Malibu. (TT 347-49). Drdul stated that she was unnerved because she needed the car to drive to work. (TT 349). She attempted to call Dixon, but his phone was turned off. (TT 350). She stated that at roughly 8 a.m., Dixon finally contacted her using his uncle, Gregory Howard's, cell phone. (TT 350). Dixon stated that he was on his way back to Drdul's home. (TT 351). Drdul stated that when Dixon returned, he was

3

wearing a black hoodie sweatshirt. (TT 351). He left again for a few moments, and when he returned, he handed Drdul two $100 bills and stated that she should use the money to pay his cell phone bill, keep $40, and save $100. (TT 352). Drdul and Dixon then got into the car. (TT 352). Drdul asked Dixon where the money came from. (TT 353). Dixon stated that he had robbed somebody. (TT 353). When Drdul inquired further, Dixon stated that he had robbed an old lady. (TT 353).

When the pair arrived at Dixon's apartment, Dixon removed jewelry and a few gold coins from his pockets and laid them on Drdul's front seat. (TT 353). Dixon told Drdul to keep the jewelry in her purse. (TT 354). While Drdul was driving to work, she received a call from Gregory Howard asking where he could find Dixon. (TT 355). He called twice more, each time asking the whereabouts of Dixon. (TT 356). Soon after, Dixon called Drdul, using Gregory Howard's cell phone, and told her to have a good day. (TT 356). That same day, Cindy Danilchak testified that she received a call from Defendant's cell phone number inquiring whether she would be available to travel to a nearby pawn shop to pawn some items. (TT 399).

On October 22, 2014, Dixon and Drdul read an article online regarding the robbery. Dixon stated that this was not how it was supposed to happen. (TT 362).

Sergeant Scott Sokol of the Rostraver Township Police Department testified that he responded to a report of a home invasion at the victim's home on October 21, 2014. (TT 415). Sergeant Sokol noted footprints outside of the home in the snow, which led to a tire burnout in the grass. (TT 417-18). Sergeant Sokol also eventually recovered two pairs of latex gloves, and orange garments that codefendant Dixon later stated they used to cover their faces. (TT 420-21). Officer Michael Sethman, who also responded to the call, testified that the piece of paper that

4

had been handed to the victim by the first individual was actually a paystub for Bobbi Drdul. (TT 805-07).

Bridget Ross testified that in the early morning hours of October 23, 2014, Lamont Dixon began "beating" on her back door. (TT 446). She testified as to the encounter with Dixon:

> **Ross:** I was with, um, a guy that he came in to talk to and he beat on the door, he was crying, he expressed that him and a couple individuals had did a home robbery and he didn't want to live no more with his past background, that they were going to give him 20 years to life, and he just wanted somebody to give him a gun so he could just end his life now because he was in so much remorse. (TT 447). He also stated that the other two individuals involved were Gregory Howard and Brandon Danilchak. (TT 447).

All three defendants were eventually arrested. Defendant was charged with one count of Robbery, Infliction of Serious Bodily Injury, 18 Pa. C.S.A. §3701(a)(1)(i), one count of Robbery, Threat of Immediate Serious Bodily Injury, 18 Pa. C.S.A. §3701(a)(1)(ii), one count of Aggravated Assault, 18 Pa. C.S.A. §2702(a)(1), one count of Simple Assault, 18 Pa. C.S.A. §2701(a)(1), one count of Unlawful Restraint, 18 Pa. C.S.A. §2902(a)(1), one count of Theft by Unlawful Taking (Movable Property), 19 Pa. C.S.A. §3921(a), one count of Receiving Stolen Property, 18 Pa. C.S.A. §3925(a), and one count of Criminal Conspiracy to commit Robbery, Burglary, and/or Theft, 18 Pa. C.S.A. §903(a)(1).

Defendant chose to represent himself at trial, with Attorney James Robinson, Esq., acting as standby counsel. A jury found Defendant guilty of all charges on July 9, 2015. Defendant was sentenced on October 1, 2015 to an aggregate term of 20 to 40 years incarceration. These post-sentence motions timely followed.

## ISSUES PRESENTED FOR CONSIDERATION:

5

Defendant has divided his 74 alleged points of error between stages of the proceedings. The first group of alleged errors is related to the pretrial stage of his case. Prior to trial, Defendant withdrew all of his pretrial motions. (*See* Order of Court dated April 22, 2014). Thus, Defendant has effectively waived issues numbered 1-49, and the Court has no jurisdiction to rule on them. The Court will now address the alleged errors asserted by Defendant at trial.

## I. WHETHER THE FACT THAT CERTAIN OFFICERS DID NOT TESTIFY AT TRIAL VIOLATED THE CONFRONTATION CLAUSE?

Defendant first asserts that none of the investigating officers were presented as witnesses by the Commonwealth, which "denied the Defendant the right to cross-examine them as per the Confrontation Clause and defend himself at trial." Thus, Defendant demands a new trial.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." In *Crawford*, the United States Supreme Court stated that the Sixth Amendment guarantees a defendant's right to confront those "who 'bear testimony' " against him, and defined "testimony" as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." 541 U.S. at 51 (2003). The Confrontation Clause prohibits out-of-court testimonial statements by a witness unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. *Id.* at 53–56.

Defendant does not refer to any statements from the above-listed officers that were used as testimony against him. Officer Scott Sokol, who responded to the 9-1-1 call, and Officer Sethman, who filed the criminal complaint against Defendant, both testified. In addition, Detective Ray Dupilka, Detective Tony Marcocci, Officer Richard Taylor, and Officer Brian Dove testified. There is no support for the claim that Defendant was not provided a witness list.

6

A simple boilerplate allegation that he was prejudiced by the Commonwealth's failure to call certain witnesses is without merit. Additionally, Defendant could have subpoenaed witnesses.

## II. WHETHER THE COURT ERRED BY NOT PROVIDING CIVILIAN CLOTHING TO DEFENSE WITNESSES?

Defendant next alleges that witnesses called by Defendant were not provided with civilian clothing to testify at trial. These witnesses were incarcerated, and testifying to statements that they heard while incarcerated. Defendant states that this is unfair, as Commonwealth witnesses were provided with civilian attire. This Court notes that it did not provide any witness with civilian attire. As Defendant chose to represent himself, it was his responsibility to ensure that they were provided with civilian clothing, perhaps by speaking with his standby counsel. The Pennsylvania Superior Court previously held that "allowing a defendant to appear before a jury panel in prison garb constitutes error warranting a new trial." *Comm. v. Kellum,* 489 A.2d 758, 762 (Pa.Super.1985). The court in that case, however, determined that the mistake in that case warranted only harmless error, as there was overwhelming evidence which pointed to the defendant as the perpetrator of the crime. *Id.* Additionally, that case refers to a defendant, not a witness.

Defendant was not denied the right to a fair trial by his witnesses testifying while wearing prison garb. First, no court in this Commonwealth has ever determined that a witness appearing in prison garb constitutes a *per se* error which warrants the granting of a new trial. Second, it was not this Court's responsibility to ensure that Defendant's witnesses were provided with civilian clothing, and Defendant did not request such clothing for his witnesses in advance. Third, Defendant cannot prove that he was prejudiced by his witness' attire, especially in light of the overwhelming evidence that was presented against him.

7

## III. WHETHER THE COMMONWEALTH WITHHELD INFORMATION REGARDING A PLEA BARGAIN WITH BRANDON DANILCHAK IN VIOLATION OF BRADY?

Defendant next alleges that the Commonwealth failed to disclose a plea bargain reached with codefendant Brandon Danilchak in exchange for testimony against Defendant. If the Commonwealth had withheld information regarding a plea agreement involving Brandon Danilchak, *Brady* and its progeny would almost certainly be implicated. According to the Pennsylvania Supreme Court:

> Under *Brady* and subsequent decisional law, a prosecutor has an obligation to disclose all exculpatory information to the guilt or punishment of an accused, including evidence of an impeachment nature. *See, e.g., Commonwealth v. Strong,* 563 Pa. 455, 761 A.2d 1167, 1171 & n. 5 (2000). To establish a *Brady* violation, an appellant must prove three elements:
> [1] the evidence [at issue] was favorable to the accused, either because it is exculpatory or because it impeaches; [2] the evidence was suppressed by the prosecution, either willfully or inadvertently; and [3] prejudice ensued.

*Comm. v. Spotz,* 18 A.3d 244, 275-76 (Pa. 2011).

Further, to constitute critical evidence, such an agreement must have been "material evidence that deprived the defendant of a fair trial"; and "impeachment evidence which goes to the credibility of a primary witness against the accused . . ." *Comm. v. Johnson,* 815 A.2d 563, 573 (Pa. 2002), *Comm. v. Strong,* 761 A.2d 1167, 1175 (Pa. 2000). Defendant carries the burden of proving, "by reference to the record, that evidence was withheld or suppressed by the prosecution." *Comm. v. Porter,* 728 A.2d 890, 898 (Pa. 1999).

Defendant's argument that a plea agreement existed with Brandon Danilchak is meritless. Defendant makes this boilerplate allegation without a scintilla of evidence to support his claim.

The assistant district attorney stated to this Court during trial:

> **ADA**: He does not have a deal. He wants to ask Mr. Danilchak about that. I know he had a prior attorney that was asking for

8

different things. We've never given a deal, we've never offered a deal. We said that's not proper.
(TT 511)

Moreover, Defendant thoroughly cross-examined Danilchak regarding any potential plea bargain reached with the district attorney's office. For example, Defendant asked the following:

**Defendant:** Did – During this meeting, were you asked for any obligation – to meet any obligations or anything of that nature?

**Danilchak:** I wasn't asked to meet any obligations. The only obligation I had to myself was to tell the truth.
(TT 542)

Further:

**Defendant:** At anytime have you made any statements to men at the county jail that you were getting a plea agreement --

**Danilchak:** No.

**Defendant:** -- for 2 to 4 years or 11 ½ to 23?

**Danilchak:** No, I never received any plea agreement, any verbal plea agreement. I never received anything like that. I have never in writing. She never spoke to me and said, sir, if you cooperate I'll give you this amount of time. That has never occurred from her or any other cops. My lawyer said we're going to try the best I can.
(TT 553)

No plea agreement was made, nor has Defendant made any cogent argument tending to prove that such an agreement ever existed. Therefore, Defendant is not entitled to a new trial on this basis.

## IV. WHETHER EXCULPATORY PHONE RECORDS FROM DEFENDANT EXISTED AND WERE WITHHELD BY THE COMMONWEALTH?

Defendant next argues that the cell phone records that were introduced by the Commonwealth, "clearly showed him on his phone in Monessen at the time of this alleged robbery." He further states that the GPS evidence "was never introduced at trial and would have been exculpatory evidence for the Defendant, denying him his right to a fair trial."

9

Glenn Bard, who was qualified during trial as an expert in the field of digital forensics, testified in regards to the cell phone records of Defendant's cell phone during the day the crime occurred. (TT 846). Bard testified that between the hours of 4:59 a.m. and 7:54 a.m., "the user activity was all either incoming forwarded or voicemail calls. No phone calls were answered or made during that time period on that device." (TT 847). Bard further testified that during that time period, the phone was using a cell phone tower in Monessen to make calls. (TT 847). After 7:54 a.m., Bard testified that a number of phone calls were exchanged. Bard stated: "During that time period that you're requesting, there was a very large volume of calls back and forth between the phones during that one hour time, some were very short, many unanswered calls, but there were six of them that stood out as being lengthy enough calls to be in communication and conversation." (TT 849).

Specifically, Bard identified a 52 second phone call to Ms. Drdul at 8:02 a.m. (TT 849). The next phone call occurred at 8:12 a.m. for one minute and 14 seconds from Ms. Drdul's phone to Defendant's phone. (TT 850). Next, Bard testified that he found a 45 second phone call from Ms. Drdul's phone to Mr. Howard's phone at 8:18 a.m. (TT 850). At 8:29 a.m., Bard stated that Ms. Drdul called Defendant's phone, and the call lasted for one minute and 14 seconds. (TT 850). At 8:38 a.m., a call lasted for 15 seconds from Defendant's phone to Ms. Drdul's phone. (TT 850). At 8:51 a.m., a call lasting eight seconds was made from Ms. Drdul's phone to Defendant's phone. (TT 850). Bard further testified that he examined both Ms. Drdul's phone and Defendant's phone, and found that the records matched. (TT 851).

Defendant extensively cross-examined Mr. Bard regarding the location of his cell phone near the time of the crime. Defendant asked:

> **Defendant:** At any time during your GPS location, was Mr. Howard's phone ever near the victim's area, the crime scene? For

10

instance, the victim lived up the street, was Mr. Howard's phone ever at the alleged victim's residence or whatever?

**Bard**: Again, near is relative. What I can say is that your phone accessed the same tower in the Monessen area the entire time, which was 4.46 miles away from that residence. As far as near, I can't state that.
(TT 857).

Defendant's argument is unclear. First, Defendant's assertion that his cell phone "clearly showed him on his phone in Monessen at the time of this alleged robbery" is inaccurate. As stated by Mr. Bard, he could only state which cell tower was being used to direct calls to and from Defendant's phone. The cell tower was located in Monessen, and was a little more than 4 miles away from the victim's residence. (TT 860). Defendant also alleges that certain evidence was withheld which would have exculpated Defendant. He does not point to exactly what evidence this was, or why he was not able to cross-examine Mr. Bard concerning this exculpatory evidence. Thus, the Court cannot cogently analyze Defendant's claims, and they are therefore meritless.

## V. WHETHER THE COURT APPOINTMENT OF ATTORNEY JAMES ROBINSON AS STANDBY COUNSEL DEPRIVED THE DEFENDANT OF DUE PROCESS RIGHTS?

Defendant next asserts that he was "denied due process of law and a fair trial when Attorney James Robinson was assigned to sit as counsel with him during his trial" as he had filed a complaint with the Pennsylvania Disciplinary Board against him prior to trial, and thus, irreconcilable differences existed between the two individuals. Notably, Defendant does not point to any error by standby counsel which prevented him from receiving a fair trial.

The Pennsylvania Supreme Court has recognized that "when a defendant elects to proceed at trial *pro se*, the defendant, and not standby counsel, is counsel of record and is responsible for trying the case. *Comm. v. Spotz,* 47 A.3d 63, 83 (Pa. 2012); *see also* Faretta v.

11

California, 422 U.S. 806, 834 (1974) ("The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction."). The Pennsylvania Supreme Court in *Blakeney* addressed a situation in which a *pro-se* appellant argued that "irreconcilable differences had arisen between standby counsel and himself, which undermined his decision to waive the presentation of mitigation evidence." *Comm. v. Blakeney*, 108 A.3d 739, 756 (Pa. 2014). The Court held that as Defendant was found competent to represent himself at trial, he was competent to comprehend the colloquy conducted by the trial court when he decided not to present mitigation witnesses. *Id.*

Unlike the case above, Defendant cannot even point to any errors by standby counsel which limited his ability to receive or conduct a fair trial. This Court cannot analyze the effectiveness of Mr. Robinson as standby counsel if no errors are alleged by Defendant.

## VI. WHETHER THE EVIDENCE PRESENTED AT TRIAL WAS SUFFICIENT FOR A GUILTY VERDICT ON ALL COUNTS?

Defendant also challenges the sufficiency of the evidence on all counts for which he was convicted. In reviewing a claim that the verdict is against the sufficiency of the evidence, a court must:

> [D]etermine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt. Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail.

*Commonwealth v. Feliciano*, 67 A.3d 19, 23-24 (Pa.Super.2013), *citing Commonwealth v. Stokes*, 38 A.3d 846, 853-854 (Pa.Super.2011) (internal citations and quotations omitted).

Further, the evidence presented at trouble need not preclude every possibility of innocence. The Superior Court in *Feliciano* established that:

12

> [T]he fact-finder is free to believe all, part, or none of the evidence presented. It is not within the province of this Court to re-weigh the evidence and substitute our judgment for that of the fact-finder. The Commonwealth's burden may be met by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. Additionally, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered.
> *Id.*

Defendant does not specify which elements of the charge of Robbery the Commonwealth failed to prove, or offer anything other than seemingly angry and incoherent boilerplate assertions that the evidence was insufficient. He states simply that "the only evidence presented was the testimony of co-defendants who cut deals with the prosecution to avoid their own trials and a lengthy prison sentence, along with the tainted testimony of the elderly victim."

Such is not the case. As discussed, *supra*, Defendant has not provided any evidence, and Brandon Danilchak made clear at trial, that no plea deal had been offered at the time of trial. The jury was free to accept or reject some or all of Danilchak's testimony. The Court will not substitute its judgment for that of the jury for the purpose of analyzing Danilchak's testimony regarding Defendant's involvement in the crime. The same is true of Lamont Dixon's testimony, and the victim's testimony. (TT 933). Ms. Tekavec testified that she heard Defendant speak on the day of the crime, and at the preliminary hearing on December 1, 2014. (TT 249). She also identified him as a heavyset African American male, and recognized that since the day of the crime, he had lost some weight. (TT 252). Officer Sethman stated that the victim's statements and descriptions of the defendants remained consistent through each interview. (TT 797). Glenn Bard also testified that Defendant's phone records tended to prove that Ms. Drdul's testimony was accurate as to the phone calls directed to and received by Defendant's phone. Video

13

surveillance footage showed the three codefendants, including Mr. Howard, exiting a white sedan outside of Defendant's apartment complex at approximately 7:17 a.m. the morning of the crime. (TT 925). That footage also showed Defendant holding a white bag, which both Lamont Dixon and Brandon Danilchak testified was used to place all of the cash and items during the robbery. (TT 926).

Pursuant to 18 Pa. C.S.A. §3701(a)(1)(i), an individual is guilty of the crime of Robbery where in the course of committing a theft, he: (i) inflicts serious bodily injury upon another; [or] (ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury. Both the victim and her doctor testified as to the extent of victim's injuries. Further, the victim testified that one of the individuals possessed a knife, and brandished it at her side as he demanded money. The victim also testified as to the amount of valuables and cash that were taken. Thus, the evidence was sufficient for a jury to find the Defendant guilty of both counts of Robbery.

Defendant also contests his conviction on the charge of Conspiracy to Commit Robbery, 18 Pa. C.S.A. §903(a)(1). For the reasons listed above, the Court finds that there was sufficient evidence for the jury to convict Defendant on this charge.

Defendant next asserts that there was a similarly scant amount of evidence to convict him of Aggravated Assault, Simple Assault, and Unlawful Restraint. Under 18 Pa.C.S.A. § 2702(a)(1), a person is guilty of Aggravated Assault if he attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life. Dr. Edward Monaco testified that the victim suffered from an acute cervical spine fracture, which carries a small chance of a spinal cord injury, leading to quadriparesis or quadriplegia. (TT 660). Moreover, Dr. Monaco stated

14

that especially because of the victim's advanced age, this bone does not heal. (TT 660). This can lead to aspiration pneumonia and complications for mobility. (TT 660-61). The victim was also required to wear a cervical collar for 24 hours a day for four months. (TT 662).

The victim testified that she was thrown across the kitchen and into a refrigerator, which caused her neck injury. (TT 216). She also testified that her ankles and hands were bound, and that she was only able to remove the bindings after twenty minutes. (TT 228). Thus, there was sufficient evidence for a jury to convict Defendant on the charge of Aggravated Assault.

For the same reasons, the evidence was also sufficient to convict Defendant of the charges of Simple Assault, 18 Pa. C.S.A. §2701(a)(1), and Unlawful Restraint, 18 Pa. C.S.A. §2902(a)(1).

Defendant next alleges that the evidence presented at trial was insufficient for a guilty verdict on the charges of Theft by Unlawful Taking, 19 Pa. C.S.A. §3921(a), and Receiving Stolen Property, 18 Pa. C.S.A. §3925(a). Again, Defendant states that the codefendants in this matter only testified as a result of hidden plea deals, and that the stolen property was recovered in Dixon's girlfriend's purse. The simple fact that none of the stolen property was found in Defendant's home does not mean that there was insufficient evidence to convict him on the above charges.

Again, the victim testified that the three individuals, Defendant among them, removed property from her home valued at thousands of dollars. An individual commits the crime of Receiving Stolen Property when "he intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed with intent to restore it to the owner." Dixon testified that all of the property taken from the home was placed in a white bag, which

15

surveillance footage shows Defendant carrying into his apartment complex shortly after the home invasion. And despite the musings of Defendant, no plea deals were offered to the codefendants which would warrant a *Brady* violation.

Similarly, an individual commits the crime of Theft by Unlawful Taking where "he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." For the same reasons listed, *supra*, the evidence was sufficient to convict Defendant of this charge.

## VII. WHETHER DEFENDANT'S CONVICTION WAS AGAINST THE WEIGHT OF THE EVIDENCE?

Last, Defendant asserts that his convictions were against the weight of the evidence. As the Pennsylvania Supreme Court explained:

> A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence[,] do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.
> *Comm. v. Widmer,* 744 A.2d 745, 751-52 (Pa. 2000).

Again, there was a plethora of evidence to support Defendant's conviction on all counts. The Commonwealth presented each of the codefendants as witnesses, and Defendant had the opportunity to cross-examine each of them in regards to their credibility and any potential plea

16

deals that may have been offered. In addition to the codefendants, the victim, Bobbi Drdul, and Bridget Ross each identified Defendant as one of the three individuals who committed the home invasion. Phone records, video surveillance, and officer reports each supported the Commonwealth witness' testimony.

Defendant's arguments in this arena are similarly convoluted. He states only "the crime was perpetrated by Mr. Howard's co-defendants, not Mr. Howard, who was in Monessen at the time of the home invasion." He further states that "the trial evidence was based upon lies perpetrated by cooperating prosecution witnesses who cut deals to avoid their own trials and a lengthy prison sentence and the tainted testimony of the elderly victim." Thus, Defendant has not provided any support for his weight of the evidence argument, and this Court finds that Defendant's convictions did not result in an injustice so great which would require this Court to grant him a new trial.

## IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA – CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA )
)
VS. ) No. 5467 C 2014
)
GREGORY DAVID HOWARD )
)
DEFENDANT )

## ORDER OF COURT

AND NOW, this _9_ day of June, 2016, for the reasons set forth in the preceding Opinion, the Defendant's Post Sentence Motions are hereby **DENIED**.

The Defendant is notified that any appeal to the Superior Court of Pennsylvania from this court's denial of her post-sentence motions must be filed within thirty (30) days from the date of this Order of Court. If the Defendant chooses to appeal the denial of the Post Sentence Motions, the Defendant will continue to be represented by Attorney Timothy Dawson.

**BY THE COURT:**

Rita Donovan Hathaway, Judge

**ATTEST:**

_____

Clerk of Courts

cc: File
    Karen Patterson, Esq., Assistant District Attorney
    Timothy Dawson, Esq., Counsel for Defendant
    James Robinson, Esq., Standby Trial Counsel
    Pamela Neiderhiser, Esq., Court Administrator's Office

18